**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| WIRELESSWERX IP, LLC, | Case No. 4:25-cv-11147-FKB-CI |
| Plaintiff, | Hon. F. Kay Behm |
| | Mag. Curtis Ivy, Jr. |
| v. | |
| AUDI OF AMERICA, INC., | |
| Defendant. | |

**OPINION AND ORDER GRANTING
AUDI'S MOTION TO DISMISS (ECF No. 12)**

In this patent infringement case, Plaintiff WirelessWerx IP, LLC ("WirelessWerx") alleges that Defendant Audi of America, Inc. ("Audi") infringes a WirelessWerx patent on a "Method and System to Control Movable Entities," U.S. Patent No. 7,323,982 (the "'982 Patent"). ECF No. 10.

Presently before the Court is Audi's Motion to Dismiss on the ground that the claims of the '982 Patent are invalid as patent ineligible. ECF No. 12. The parties have submitted written briefs explaining their positions on whether the claims of the '982 Patent recite patent eligible subject matter. ECF Nos. 12, 15, 19. The Court held oral argument on February 18, 2026. ECF No. 22. For the reasons stated in this Opinion and Order, the Court will **GRANT** Audi's Motion to Dismiss.

1

## I.      PROCEDURAL HISTORY

On April 21, 2025, WirelessWerx filed a Complaint for patent infringement against Audi, alleging that Audi infringes the claims of the '982 Patent. ECF No. 1. On May 27, 2025, the Court extended the deadline for Audi to answer or otherwise respond to the Complaint to August 2, 2025. ECF No. 6. In the meantime, on July 2, 2025, WirelessWerx filed the operative pleading, a First Amended Complaint (the "FAC"). ECF No. 10. On August 1, 2025, instead of answering the FAC, Audi filed its present Motion to Dismiss, asking the Court to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6) on the ground that the claims of the '982 Patent are invalid as patent ineligible under Section 101 of the Patent Act, 35 U.S.C. § 101. ECF No. 12. WirelessWerx filed an Opposition on August 15, 2025, and Audi filed a Reply on August 29, 2025. ECF Nos. 15, 19.

## II.     '982 PATENT

The '982 Patent is titled "Method and System to Control Movable Entities." The '982 Patent is part of a patent family whose family members claim priority to a provisional patent application filed on November 5, 2004. With respect to the '982 Patent, the patent application was filed on April 13, 2005 and the patent issued on January 29, 2008.

### A.   Overview

The '982 Patent is directed to computer-based tracking systems for vehicles, such as tracking systems used to manage vehicle fleets. '982 Patent 1:29-53. In the written description, the '982 Patent describes that existing tracking systems utilized Global Positioning System (GPS) technology to provide various benefits, but were limited to relaying position information from a vehicle to a control center that could display the vehicle's position on a computer map. *Id.* 1:48-53. The '982 Patent discloses a tracking system whose hardware components and software features allow users to remotely monitor and control vehicles in relation to preconfigured events and preconfigured geographical zones. *Id.* 1:21-25; 1:57-59; 6:31-33. As its basic components, in addition to a wireless communications network, the tracking system includes a transponder for each vehicle, a client console for users to interact with the transponder, and a backend control system for handling communications between the transponder and the client console. *Id.* 8:16-9:8; 18:38-22:61.

As one benefit of the tracking system, the '982 Patent discusses the transponder's features for monitoring and controlling the vehicle. In the vehicle, the transponder gathers vehicle status information, such as position and speed information, and controls vehicle functions, such as turning the ignition on or off and locking or unlocking the doors. *Id.* 6:38-43; 7:20-36; 10:30-32; 11:6-9. Moreover, the transponder analyzes vehicle status information based on logical

parameters to recognize the occurrence of events, such as when the vehicle exceeds a speed threshold, and controls vehicle functions assigned to the events. *Id.* 6:65-7:5; 11:59-60; 12:8-10; 12:17-14:49. In conjunction with its local operation in the vehicle, the transponder sends vehicle status information and event messages to the client console through the backend control system. *Id.* 7:6-11; 8:33-38; 8:53-57. The client console then displays the vehicle's position on a computer map, along with event messages and any other vehicle status information from the transponder. *Id.* 23:14-24:43.

As another benefit of the tracking system, the '982 Patent discusses the client console's features for users to interact with the transponder. Using the client console, users can send commands to the transponder through the backend control system, including queries for vehicle status information, commands for controlling vehicle functions, and commands for configuring the transponder. *Id.* 7:57-61; 7:66-8:5; 8:33-38; 8:53-57; 17:33-18:17; 21:58-22:45. To configure the transponder, users can enable events, as well as configure the events by selecting the desired logical parameters and assigning the desired vehicle functions. *Id.* 12:17-14:49; 22:32-36. For example, the tracking system includes an "excessive idle" feature. In this example, to reduce fuel use, the transponder can be configured to turn the ignition off when the vehicle has not moved a preselected distance over a preselected time interval. *Id.* 7:61-65; 14:36-49.

### B.      Geofencing Feature

In connection with the above benefits of the tracking system, the claims of the '982 Patent are directed to a "geofencing" feature. The disclosed geofencing feature involves geographical zones, such as zones tracing the routes of streets or highways, or the borders of premises, cities, or states. *Id.* 8:6-11. Using the client console, users can configure a given geographical zone by opening a computer map and selecting any number of coordinates to serve as deflection points for creating line segments that enclose the area of the geographical zone. *Id.* 15:8-13; 25:8-18. Users can then select the desired geographical zones to be downloaded to the transponder, enable zone entry and zone exit events, and assign the desired vehicle functions to the events. *Id.* 15:16-18; 15:37-52; 25:19-31. In the vehicle, the transponder uses the coordinates to define the geographical zones. *Id.* 15:19-30; 15:53-61. The transponder then recognizes when the vehicle enters or exits the geographical zones, sends event messages that allow users to track the vehicle through the geographical zones, and controls vehicle functions assigned to the events. *Id.* 14:54-55; 17:14-26. For example, the transponder can be configured to lock the doors when the vehicle enters or exits a geographical zone. *Id.* 17:28-31.

In one embodiment, after users configure a given geographical zone on a computer map, the transponder uses a pixilated image to store the geographical zone and recognize when the vehicle enters or exits the geographical zone. In this

embodiment, the transponder assigns (or "maps") both the coordinates for the geographical zone and the coordinates for the transponder's position to pixels (or "squares") on the pixilated image (or "pixel map"). *Id.* 15:53-63. With respect to the pixels for the geographical zone (or "deflection points"), the transponder activates (or "marks") them and those between them to create an enclosed area that defines the geographical zone. *Id.* 15:8-13; 15:19-30. After activating the pixels belonging to the geographical zone, the transponder determines whether the vehicle is inside or outside the geographical zone by calculating whether the pixel for the transponder's position (or "position fix") is activated or deactivated. *Id.* 15:61-63; 17:1-4.

### C.    Claims

The '982 Patent has sixty-one claims, including independent claims 1, 20, and 43. The claims, all of which are method claims, recite methods of wirelessly controlling an entity (e.g., a vehicle) in relation to a geographical zone through the use of a computing device, a transponder attached to the entity, and a pixilated image. *Id.* 27:30-32:41. By agreement of the parties, Claim 1, which WirelessWerx treats as exemplary for purposes of alleging infringement, is also representative for

purposes of resolving patent eligibility.[1] Representative Claim 1 recites four method steps:

> **1.** A method to wirelessly control an entity having an attached transponder, comprising:
> loading from a computing device to a transponder's memory a plurality of coordinates;
> programming a microprocessor of the transponder to define a geographical zone by creating an enclosed area on a pixilated image using said plurality of coordinates, wherein said enclosed area is representative of a geographical zone;
> programming the microprocessor in the transponder to determine the occurrence of an event associated with a status of the entity in relation to the geographical zone; and
> configuring the microprocessor to execute a configurable operation if the event occurs.

*Id.* 27:30-44.

As set forth in the claim language, representative Claim 1 recites interrelated hardware and software limitations directed to the disclosed geofencing feature. In connection with the recited entity, computing device, transponder, and pixilated image, the claim language centers on the relationship between a plurality of coordinates, a geographical zone, an event, and a configurable operation. According to the claim language, first, in the "loading" step, the coordinates are loaded from the computing device to the transponder's memory. Second, in the "programming"

---

[1] The Court has reviewed the claim set of the '982 Patent and agrees with the parties that Claim 1 is representative of all claims. Accordingly, the Court, like the parties, will treat Claim 1 as representative.

step for defining the geographical zone on the pixilated image, the transponder's microprocessor is programmed to use the coordinates to create an enclosed area representative of the geographical zone. Third, in the "programming" step for recognizing when the entity enters or exits the geographical zone, the transponder's microprocessor is programmed to determine the occurrence of an event associated with the status of the entity in relation to the geographical zone. Fourth, in the "configuring" step for controlling the entity in relation to the geographical zone, the transponder's microprocessor is configured to execute the configurable operation if the event occurs.

## III.   LEGAL STANDARDS

In accordance with the jurisprudence of the Court of Appeals for the Federal Circuit, district courts adjudicating patent cases apply the law of the Federal Circuit to questions pertaining to patent law and the law of the regional circuit, here, the Court of Appeals for the Sixth Circuit, to procedural questions. *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356 (Fed. Cir. 2007). Whether to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is a "purely procedural question" governed by the law of the regional circuit. *Id.*

### A.   Pleading

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). A complaint that fails to make such a showing may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

When deciding a motion to dismiss under Rule 12(b)(6), a district court must accept all of the factual allegations contained in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). Beyond the plaintiff's complaint and any exhibits attached thereto, a district court may consider public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss so long as the documents are "referred to" in the complaint and "central to" the claims. *Bassett v. Nat'l Collegiate Athletics Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

In order to survive a Rule 12(b)(6) motion, a complaint need only contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Determining whether a complaint states a plausible claim for

9

relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

### B. Patent Eligibility

The Patent Act establishes invalidity as a defense to infringement. 35 U.S.C. § 282(b). Under an invalidity defense, an accused infringer can "attempt to prove that the patent never should have issued in the first place." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011). A patent enjoys a statutory presumption of validity, and the party asserting invalidity must prove invalidity by clear and convincing evidence. 35 U.S.C. § 282(a); *Microsoft*, 564 U.S. at 95. Settling a previously debated issue, the Federal Circuit has held that a patent is presumptively patent eligible. *Compare Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721 (Fed. Cir. 2014) (Mayer, J., concurring) (stating that "no presumption of eligibility attends the section 101 inquiry"), *with Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (holding that accused infringer must prove patent ineligibility

before a patent loses the statutory presumption of validity and rejecting district court's contrary conclusion based on *Ultramercial* concurrence).

A claim of a patent is invalid if it is not directed to patent eligible subject matter pursuant to Section 101. Section 101 provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. But the Supreme Court has held that the statutory definition of patent eligible subject matter includes an implicit exception for laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The judicially created exception is driven by a concern of preemption. *Id.* Laws of nature, natural phenomena, and abstract ideas are not patent eligible because they are "building blocks of human ingenuity." *Id.* at 217. In determining patent eligibility, courts must distinguish between patents that "claim the building blocks" and those whose claims "integrate the building blocks into something more." *Id.*

Supreme Court cases "have endorsed a bright-line prohibition against patenting laws of nature, mathematical formulas, and the like." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 89 (2012). At the same time, the Supreme Court has instructed courts to "tread carefully" lest the judicial exception "swallow all of patent law." *Alice*, 573 U.S. at 217. It is not enough that the claims "involve" a patent ineligible concept because "[a]t some level, all inventions

11

embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* (quotation and alteration omitted).

The Supreme Court has articulated a two-step framework for determining patent eligibility. *Alice*, 573 U.S. at 217-18 (citing *Mayo*, 566 U.S. at 72-73, 77-79). At step one, courts must determine whether the claims are "directed to" a patent ineligible concept, such as an abstract idea. *Id.* at 218. If the claims are directed to a patent ineligible concept, then, at step two, courts must consider the claim elements "both individually and as an ordered combination" to determine whether the claims contain "additional elements" that constitute an "inventive concept" sufficient to "transform" the concept into a patent eligible "application." *Id.* at 217-18 (quotations omitted). These "additional elements" must involve more than performance of "well-understood, routine, conventional activities previously known to the industry." *Id.* at 225 (quotation and alteration omitted).

Patent eligibility is a question of law based on underlying factual findings. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). At step two, the determination of whether the claims contain an inventive concept is a question of law that may be informed by factual determinations of whether a claim element or a combination of claim elements was well-understood, routine, and conventional. *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (citing *Berkheimer*, 881 F.3d at 1368). Any fact concerning whether a claim element or

12

combination of claim elements was well-understood, routine, and conventional must be proven by clear and convincing evidence. *Berkheimer*, 881 F.3d at 1368 (citing *Microsoft*, 564 U.S. at 95).

### C.    Resolving Patent Eligibility at The Pleadings Stage

Patent eligibility may be resolved at the pleadings stage where the undisputed facts, considered under the standards required by Rule 12(b)(6) or Rule 12(c), require a holding of patent ineligibility under the substantive legal standards. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018). Under generally applicable Rule 12(b)(6) requirements, a district court may proceed with resolving patent eligibility at the pleadings stage "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). As such, the Federal Circuit has explained that "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Id.* (quotation and alterations omitted). As with factual allegations in the complaint, the Federal Circuit has instructed that patent disclosures supporting patent eligibility must be accepted as true. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369-70 (Fed. Cir. 2020) (identifying "a number of advantages" disclosed in the written description and "accept[ing] those statements as true and

consider[ing] them important" in holding at step one that the challenged claims were not directed to an abstract idea).

## IV.   PATENT ELIGIBILITY ANALYSIS

Audi's Motion to Dismiss centers on the abstract ideas exception to patent eligibility. The abstract ideas exception to patent eligibility "embodies the longstanding rule that an idea of itself is not patentable." *Alice*, 573 U.S. at 218 (quotations and alteration omitted). "As to the abstract idea exception, no single, hard-and-fast rule that automatically outputs an answer in all contexts exists because there are different types of abstract ideas, including (1) methods of organizing human activity, such as fundamental economic practices; (2) claims to mental processes, even if performed on a computer rather than in the human mind; and (3) claims to results rather than to a means of achieving the claimed result." *In re Killian*, 45 F.4th 1373, 1381-82 (Fed. Cir. 2022) (quotations, alterations, and citations omitted).

### A.   Step One

The Court will now turn to the patent eligibility analysis. At step one, the Federal Circuit has instructed courts to look to whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d

14

1299, 1314 (Fed. Cir. 2016). To do so, courts consider the claims in their entirety to ascertain whether their "character as a whole" is directed to an abstract idea, as well as the written description, as it informs the understanding of the claims. *CardioNet*, 955 F.3d at 1367-68 (quotation omitted). In characterizing what the claims are "directed to" at step one of the patent eligibility analysis, the Federal Circuit has instructed that courts "be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *Id.* at 1371 (quotation omitted). Although step one and step two "involve overlapping scrutiny of the content of the claims," the Supreme Court's two-step framework "makes clear that the first-stage filter is a meaningful one, sometimes ending the § 101 inquiry." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citing *Alice*, 573 U.S. at 218).

For computer-related technology like the tracking system of the '982 Patent, a relevant inquiry is "whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). The Federal Circuit has explained this distinction by contrasting "claims that focus on an improvement in computers and other technologies as tools" and "claims that focus on certain independently abstract ideas that use computers as tools." *CardioNet*, 955 F.3d at 1371 (quotations and alteration omitted). "Software can make patent-eligible improvements to computer

15

technology, and related claims are eligible as long as they are directed to non-abstract improvements to the functionality of a computer or network platform itself." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (quotation and alteration omitted). "If," on the other hand, "a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one." *BSG Tech*, 899 F.3d at 1285 (citing *Alice*, 573 U.S. at 218-21). Furthermore, the Federal Circuit has instructed that "claims are not saved from abstraction merely because they recite components more specific than a generic computer." *Id.* at 1286. Even when they require "concrete, tangible components," claims are nevertheless directed to an abstract idea when "the recited physical components merely provide a generic environment in which to carry out the abstract idea." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016).

### 1.   Arguments of the Parties

In its Motion to Dismiss, Audi argues at step one that representative Claim 1 of the '982 Patent is directed to the abstract idea of "monitoring objects in space." Audi's basic contention is that the claim language "simply verbalizes the abstract idea of monitoring an object in space and taking some unspecified action if the object leaves the space." ECF No. 12, PageID.159. As described by Audi, the claim language recites monitoring an object (an "entity") in space (a "geographical zone") through the use of rudimentary location information ("coordinates") on a generic

16

computer display (a "pixelated image"). *Id.*, PageID.163. Audi variously argues that representative Claim 1 recites an abstract idea falling in the categories of a method of organizing human activity, a mental process, and a process of collecting and analyzing information.

In its Opposition, WirelessWerx argues that representative Claim 1 of the '982 Patent is focused on the technological improvement of "wireless control of an entity through an attached transponder in a geographical zone that is defined by a plurality of coordinates in the memory of the transponder." ECF No. 15, PageID.294. WirelessWerx points out that, in the written description, the '982 Patent describes that existing tracking systems were limited to relaying position information from a vehicle to a control center that could display the vehicle's position on a computer map. '982 Patent 1:50-53. WirelessWerx argues that representative Claim 1 recites "a technological solution to this problem," and particularly one "directed at a solution to a problem unique to wirelessly controlling an entity within a geographic zone." ECF No. 15, PageID.296, 299. As explained by WirelessWerx, the claim language "specifies the elements of (1) an entity, (2) a transponder, (3) a microprocessor, and (4) a pixilated image of an enclosed area representative of a geographical zone, which, when programmed, is a specific implementation of a technological improvement to entity tracking." *Id.*, PageID.290.

17

In support of its argument, WirelessWerx distinguishes the '982 Patent both from patents "where an entity's location information is merely monitored and transmitted relative to a defined geographical zone" and from patents "directed to controlling entities." *Id.*, PageID.298-299. Furthermore, WirelessWerx argues that "the claims are not directed to a method of organizing human activity or a mental process performed on a computer or a means of achieving a claimed result without describing how to achieve the result." *Id.*, PageID.293. Instead, WirelessWerx argues that "there are concrete meaningful steps that illustrate that the claims are patent eligible" in "the elements of (1) an entity, (2) a transponder, (3) a microprocessor, and (4) a pixilated image of an enclosed area representative of a geographical zone, which, when programmed, is a specific implementation of a technological improvement to entity tracking." *Id.* According to WirelessWerx, the disclosure of the '982 Patent "provides substantial detail for the claimed invention and its interconnectivity with each claim element for sufficient specificity to be concrete," and "the claimed method is very detailed on how the transponder exercises wireless control to execute an operation, such as shutting down an ignition, if an event occurs in relation to a geographic zone thus defining concrete steps that further render the claims patentable." *Id.*, PageID.296-297.

       **2.**      **Representative Claim 1 is Directed To Location-Based Control**

At step one of the patent eligibility analysis, as instructed by the Federal Circuit, the Court will begin by determining what representative Claim 1 of the '982 Patent is "directed to." As described in the written description and recited by the claim language, representative Claim 1 is directed to the concept of location-based control. As set forth above, representative Claim 1 is directed to the disclosed geofencing feature. To summarize, representative Claim 1 recites method steps for monitoring and controlling an entity which the written description describes as being directed to using coordinates to define a geographical zone on a pixilated image, recognizing when the entity enters or exits the geographical zone, and then controlling the entity in relation to the geographical zone. In the written description, the '982 Patent confirms that the focus is on location-based control, i.e., monitoring the location of an entity and taking some action to control the entity based on its location. As stated by the '982 Patent, the disclosure relates to "controlling movable entities" and "[i]n particular" to "systems and methods to remotely control and monitor movable entities functions and positioning data in relation to pre-configured geographical zones." '982 Patent 1:21-25.

The Court notes that, with reference to Audi's characterization of what representative Claim 1 is "directed to," namely, "monitoring objects in space," WirelessWerx urges against oversimplifying the claim language and reading out claim elements. As WirelessWerx points out, the method steps recited in

19

representative Claim 1 are performed through the use of specified hardware (a transponder attached to the entity), position information (coordinates), and storage (an enclosed area on a pixilated image). However, in the context of the computer-based tracking system of the '982 Patent, the claim elements do not shift the focus of representative Claim 1 as a whole away from the core concept of location-based control. As will become clear from the below discussion, the claim elements serve to provide a generic computer environment for performing location-based control, not impose limitations that embody any computer functionality improvements.

As explained below, having considered the arguments of the parties in light of the relevant caselaw, the Court finds that the concept of location-based control as recited in representative Claim 1 of the '982 Patent is an abstract method of organizing human activity, an abstract mental process, and an abstract process of collecting and analyzing information.

### 3.   Representative Claim 1 Recites a Method of Organizing Human Activity

In proceeding with step one of the patent eligibility analysis, the Court will first consider Audi's argument that representative Claim 1 recites a method of organizing human activity. The Supreme Court has held that "fundamental economic practice[s] long prevalent in our system of commerce" are abstract ideas. *Alice*, 573 U.S. at 219. Additionally, the Federal Circuit has held that similar concepts qualifying as abstract ideas include "well-established method[s] of organizing

activity" and "fundamental, long-prevalent practice[s]." *BSG Tech*, 899 F.3d at 1286.

In connection with its argument that Claim 1 is directed to the abstract idea of "monitoring objects in space," Audi argues that "humans have practiced the claimed technique for millennia by using maps to set geographical boundaries and monitor when entities cross those boundaries." ECF No. 12, PageID.157. Moreover, Audi argues that the written description and the FAC "are devoid of any language or allegation suggesting that this claimed method is anything other than routine human activity dressed in the language of conventional computer components." *Id.*, PageID.159. On the other hand, WirelessWerx argues that "the claims are not directed to a method of organizing human activity" because representative Claim 1 "is limited by the elements of (1) an entity, (2) a transponder, (3) a microprocessor, and (4) a pixilated image of an enclosed area representative of a geographical zone, which, when programmed, is a specific implementation of a technological improvement to entity tracking." ECF No. 15, PageID.293.

As explained below, in light of the disclosure of the '982 Patent regarding the geofencing feature, the Court finds that representative Claim 1 recites an abstract method of organizing human activity. To introduce the below discussion, the Court notes that, in the written description, the '982 Patent contemplates various embodiments of the geofencing feature. Generally, the embodiments involve an

entity, such as a vehicle, and combinations of geographical zones configured by users and configurable operations that users can assign to the associated zone entry and zone exit events.

With respect to embodiments in which the entity is a vehicle, the '982 Patent describes many possibilities through unconnected lists of example geographical zones and example configurable operations. Among other examples, the '982 Patent explains that geographical zones can include highways, premises, and cities, and that configurable operations can include turning the ignition on or off, increasing or decreasing the speed, locking or unlocking the doors, and opening or closing the windows. '982 Patent 7:20-36; 8:6-11. Such generic examples of commonly encountered areas and commonly controlled vehicle functions bring to mind familiar combinations that embody routine actions drivers have always performed in the manual operation of vehicles. By extension, the examples demonstrate that representative Claim 1 broadly covers embodiments in which the transponder is configured to perform everyday actions performed by drivers.

As perhaps the most illustrative embodiment, representative Claim 1 covers a configuration in which the transponder can turn the ignition off when the vehicle arrives at a home, workplace, or other destination. As well, representative Claim 1 covers configurations in which the transponder can increase the speed when the vehicle gets onto a highway, or lock the doors and/or close the windows when the

22

vehicle passes into a dangerous city. Likewise, to the extent the '982 Patent describes specific embodiments, the embodiments merely involve combinations of areas and vehicle functions inherent in the manual operation of existing specialty vehicles. For example, the '982 Patent explains that the transponder could be configured to unlock an armored truck's back door when it arrives at a bank, or turn a tanker truck's fuel pumps on when it arrives at a gas station. *Id.* 17:64-67. Similarly, the '982 Patent explains that the transponder could be configured to turn a military vehicle's firing ability off when it enters a peaceful zone. *Id.* 27:12-16.

Furthermore, the scope of representative Claim 1 reaches far beyond embodiments in which the entity is a vehicle. As the '982 Patent explains throughout the written description, the term "entity" refers to not only vehicles, but also people, animals, and any other objects desirable to monitor and control. As stated by the '982 Patent, the "present disclosure" (i.e., the invention) relates to monitoring and controlling a "moving object" or a "static object prone to be moved," and such objects can be "many things." *Id.* 26:33-39. Along with "any other item where tracking its movement and/or location is beneficial," entities can be everything from vehicles, aircraft, and watercraft, to people, animals, organs, and produce, to medicine, chemicals, and weapons. *Id.* 26:36-50. And the transponder, for its part, can be a unit "of many different sizes," including a micro- or nano-scale unit, that can be "mounted, attached, manufactured, or otherwise included upon or within"

23

such objects. *Id.* 26:50-54. Moreover, with respect to controlling such objects, the transponder can issue "any command" that can "change, alter, or enhance, the mechanism, the function, the structure or the composition" thereof. *Id.* 26:60-63.

In short, in conjunction with the generically worded claim language, the '982 Patent contemplates embodiments in which the entity is any movable object, whether man-made or existing in nature, the geographical zone is any space on land, in air, or at sea, and the configurable operation is any action to control the entity. Even considering only embodiments in which the entity is a person or an animal, the geofencing feature encompasses countless practices fundamental to managing activity in designated areas. As Audi points out, age-old analogs include shepherds and their use of fences and dogs to control flocks of sheep. Similarly, more modern analogs also prevalent for some time include the way homeowners use underground fences and collars to keep dogs in their yards, and the way parole officers use ankle monitors to receive alerts if parolees leave permitted areas.

In its most colorful analogy, Audi cites the example of Julius Caesar crossing the Rubicon River in 49 B.C.[2] The Court finds this analogy instructive on how representative Claim 1 can be read upon basic management of a person's activity in

---

[2] For a detailed account of the relevant historical events, *see generally* Alyssa Kotva, *Julius Caesar Crosses the Rubicon*, ORIGINS: Current Events in Historical Perspective (Jan. 2024), https://origins.osu.edu/read/julius-caesar-crosses-rubicon.

24

a designated area in a generic computer environment where the transponder and the pixelated image serve as the computer versions of a human and a paper map. Specifically, in the leadup to the Roman Civil War, the Roman Senate forbade Caesar (an "entity") from returning to Italy in command of the army he had amassed in Gaul. As a Roman map (the paper version of a "pixelated image") would have depicted, the Rubicon marked the boundary between this northern province and the southern heartland of Italy proper (an "enclosed area" thereon representing a "geographical zone" having "coordinates"). Once armed with this knowledge, any eyewitness (the human version of a "transponder") on watch at the time could have observed Caesar and his troops crossing the Rubicon into Italy (an "event" associated with his "status" in relation thereto) and prompted the opposing Roman troops to action (a "configurable operation").

In summary, as described in the written description and recited by the claim language, the geofencing feature to which representative Claim 1 is directed encompasses a variety of longstanding human activities, including both everyday actions performed by drivers, and prevalent practices fundamental to managing activity in designated areas. Accordingly, the Court finds that representative Claim 1 recites subject matter that qualifies as an abstract method of organizing human activity.

### 4.       Representative Claim 1 Recites a Mental Process

Next, the Court will consider Audi's argument that representative Claim 1 recites a mental process. As another reason why representative Claim 1 is directed to an abstract idea, Audi argues that all of the method steps could be performed mentally or by hand by a human. Specifically, Audi argues that the method steps could be performed by "writing down location coordinates, drawing a geographical zone, determining when an entity leaves the zone, and then taking some action." ECF No. 12, PageID.167. On the other hand, WirelessWerx argues that "the claims are not directed to … a mental process performed on a computer." ECF No. 15, PageID.293.

The Federal Circuit has explained that "a telltale sign of abstraction" is when claims recite mental processes. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021). The Federal Circuit has described mental processes as methods that "can be performed in the human mind" or "by a human using a pen and paper." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011). Mental processes are not patent eligible because "the application of only human intelligence to the solution of practical problems is no more than a claim to a fundamental principle." *Id.* at 1371 (quotation and alteration omitted).

In light of the disclosure of the '982 Patent, the Court finds that representative Claim 1 recites an abstract mental process. With respect to the claim language, representative Claim 1 recites four method steps for monitoring and controlling an

entity. The first and second method steps are directed to using coordinates to define a geographical zone on a pixilated image. Specifically, the claim language recites that: (1) the coordinates are loaded to the transponder's memory; and (2) the transponder's microprocessor is programmed to use the coordinates to create an enclosed area representative of the geographical zone on the pixilated image. The third method step is directed to recognizing when the entity enters or exits the geographical zone, and the fourth method step is directed to controlling the entity in relation to the geographical zone. Specifically, the claim language recites that: (3) the transponder's microprocessor is programmed to determine the occurrence of an event associated with the status of the entity in relation to the geographical zone; and (4) the transponder's microprocessor is configured to execute a configurable operation if the event occurs.

As set forth above, the written description demonstrates that representative Claim 1 broadly covers embodiments in which the entity is a vehicle and the transponder is configured to perform everyday actions performed by drivers. As an illustrative embodiment, the Court will refer to the configuration in which the transponder can turn the ignition off when the vehicle arrives at a destination. In this embodiment, all of the method steps performed by the transponder could be performed mentally and using a paper map and a pen by a human driver when planning and making a trip to the destination. Just like the transponder, the driver

27

could: (1) write down the coordinates of the destination; (2) use the coordinates to draw an outline around the destination on the map; (3) compare the map with their surroundings to comprehend their arrival at the destination; and (4) given their arrival, remember to go ahead and turn the ignition off. As the Federal Circuit has explained, the transponder recited in representative Claim 1 "do[es] this in a computer environment, but that doesn't transfigure an idea out of the realm of abstraction." *PersonalWeb*, 8 F.4th at 1316 (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) ("An abstract idea on an Internet computer network or on a generic computer is still an abstract idea.")). *See also Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) (holding at step one that claims on a computer-based system for screening e-mail messages were directed to an abstract idea because the claimed system was analogous to a conventional corporate mailroom and "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper").

### 5.   Representative Claim 1 Recites a Process of Collecting and Analyzing Information

In connection with Audi's above argument that representative Claim 1 recites a mental process, the Court will now consider Audi's related argument that representative Claim 1 recites a process of collecting and analyzing information. In addition to holding that mental processes are abstract ideas, the Federal Circuit has

28

held that the mental processes exception to patent eligibility "undergirds" an information-based category of abstract ideas. *Elec. Power*, 830 F.3d at 1355. "Information as such is an intangible." *Id.* at 1353. Accordingly, "collecting information, including when limited to particular content (which does not change its character as information)," and "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more," is an abstract idea. *Id.* at 1353-54 (collecting cases). And "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* at 1354 (collecting cases). The Federal Circuit has held that "even if a process of collecting and analyzing information is limited to particular content or a particular source, that limitation does not make the collection and analysis other than abstract." *SAP*, 898 F.3d at 1168 (quotations omitted) (citing *Elec. Power*, 830 F.3d at 1353, 1355 (collecting cases)).

Audi argues that representative Claim 1 "generically recites activities of collecting, analyzing, and displaying data to define a geographical zone, and performing an unstated operation if an entity leaves the zone." ECF No. 12, PageID.162. As described by Audi, the claim language involves "the use of computers as a tool" to make "a basic geographic determination" of the occurrence of an event as a condition for executing a configurable operation. *Id.*, PageID.166.

29

Audi argues that representative Claim 1 is directed to an abstract idea because such "simple cause-effect geographic decisions" are abstract. *Id.* On the other hand, WirelessWerx argues that the claims of the '982 Patent are distinguishable from claims "limited to collecting, comparing, and reporting data using conventional components" because they "are directed towards wireless control of an entity through an attached transponder in a geographical zone that is defined by a plurality of coordinates in the memory of the transponder." ECF No. 15, PageID.299.

In light of the disclosure of the '982 Patent, the Court finds that representative Claim 1 recites an abstract process of collecting and analyzing information. As set forth above, representative Claim 1 recites method steps for monitoring and controlling an entity which the written description describes as being directed to using coordinates to define a geographical zone on a pixilated image, recognizing when the entity enters or exits the geographical zone, and then controlling the entity in relation to the geographical zone. As WirelessWerx points out, the method steps are performed through the use of a transponder attached to the entity. However, WirelessWerx does not identify any claim language that goes further than invoking the transponder as a tool to perform a method focused on "collecting information" of a "particular content," "analyzing information by steps people go through in their minds, or by mathematical algorithms," and taking some action "as an ancillary part of such collection and analysis." *Elec. Power*, 830 F.3d at 1353-54. Indeed, the

30

written description explains that, in the context of the tracking system, the transponder simply serves as an "intelligent device" that "works to collect, process, and communicate information" about an entity and can "issue various commands and instructions" thereto. '982 Patent 6:38-45. *See also id.* 6:67-7:5 (explaining that the transponder can "report, observe, recognize, process, and analyze numerous configurable events or configurable operations"). In accordance with the Federal Circuit's guidance on the information-based category of abstract ideas, the Court therefore concludes that representative Claim 1 falls into "a familiar class of claims 'directed to' a patent-ineligible concept." *Elec. Power*, 830 F.3d at 1353.

### 6.      Representative Claim 1 is Analogous to Other Claims Held to be Directed To Abstract Ideas

As a further confirmation of abstractness, the Court notes that representative Claim 1 is similar to other claims involving location-based decision-making that the Federal Circuit has held to be directed to abstract ideas.

For instance, in *Beteiro*, the Federal Circuit addressed claims directed to "exchanging information concerning a bet and allowing or disallowing the bet based on where the user is located." *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355 (Fed. Cir. 2024). The representative claim consisted of a "series of abstract steps," including "receiving a bet message that includes information regarding a bet to be placed and the location of the user," "determining whether the bet is allowed or disallowed using the location information," and "processing information for placing

31

the bet or disallowing the bet." *Id.* In holding at step one that the claims were directed to an abstract idea, the Federal Circuit explained that the claims "exhibit several features that are well-settled indicators of abstractness." *Id.* Among other things, the claims "broadly recite[d] generic steps of a kind [the Federal Circuit] ha[s] frequently held are abstract," including the "determining" step regarding "whether the bet is allowed based on location data," as well as the "processing information" step for "allowing or disallowing the bet." *Id.* Furthermore, the claims were "broadly analogous" to claims "involving methods of providing particularized information to individuals based on their locations" that the Federal Circuit has held to be abstract. *Id.* at 1356 (citing, *e.g.*, *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (holding that "providing different newspaper inserts based upon the location of the individual" is an abstract idea); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that "conveying regional content to out-of-region recipients" is an abstract idea)).

Similarly, in *ShoppersChoice*, the Federal Circuit addressed a claim directed to "providing advance notification of the pickup or delivery of a mobile thing." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1181 (Fed. Cir. 2020). The claim recited "computer program code" that, among other things, "monitors the location of a mobile thing," and "initiates notification to the first party in advance of arrival of the mobile thing based in part on the location of the mobile

thing." *Id.* In holding at step one that the claim was directed to an abstract idea, the Federal Circuit explained that these functions "amount to nothing more than the fundamental business practice of providing advance notification of the pickup or delivery of a mobile thing." *Id. See also*, *e.g.*, *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (holding that "providing information … based on meeting a condition" by "matching a GPS location indication with a geographic location" is an abstract idea); *Geoscope Techs. Pte. Ltd. v. Google LLC*, Nos. 2024-1003, 2024-1018, 2025 U.S. App. LEXIS 10623, at *6 (Fed. Cir. May 2, 2025) (holding that claims directed to "determining the location of a mobile device by collecting data about known locations (such as information about the properties of signals transmitted by different cell towers), organizing that data in a database, and then comparing that data to measurements from the mobile device" recited an abstract process of collecting, comparing, and reporting information); *Cascades Branding Innovation LLC v. Aldi, Inc.*, No. 2024-1729, 2025 U.S. App. LEXIS 24800, at *6 (Fed. Cir. Sept. 25, 2025) (holding that claims directed to "collecting geographic information about the location of a device and nearby stores or businesses offering certain products, and displaying that information to the user" recited an abstract process of collecting, analyzing, and displaying information).

> **7.      Representative Claim 1 Recites a Generic Computer Implementation**

Lastly, the Court will consider WirelessWerx's argument that representative Claim 1 is focused on a technological improvement to tracking systems. In an argument it asserts repeatedly throughout its Opposition, WirelessWerx variously describes the technological improvement as "wireless control" and as "local control" of an entity "through an attached transponder in a geographical zone that is defined by a plurality of coordinates in the memory of the transponder." ECF No. 15, PageID.302-303. The different formulations reflect that the transponder performs the method steps both "locally" (or "onboard") from the perspective of the entity and "wirelessly" (or "remotely") from the perspective of a conventional control center.

In support of its argument, WirelessWerx cites passages from the background and summary sections of the written description. Before introducing the geofencing feature to which representative Claim 1 is directed as a way of maximizing the benefits of utilizing GPS technology, the '982 Patent describes that existing tracking systems were limited to relaying position information from a vehicle to a control center that could display the vehicle's position on a computer map:

> In fleet management, GPS vehicle tracking systems allow increasing fleet efficiency, reducing operating costs such as fuel costs, and supervising the correct operation of deliveries, pick-ups, and routes associated with fleet operation.
>
> *     *     *
>
> While current GPS vehicle tracking systems provide benefits such as increased productivity and safety, these benefits are yet to be maximized. Current systems are limited to relaying the GPS information to a control center

34

> or a web server and plotting the position of the vehicle on a computer map.
>
> *     *     *
>
> The present disclosure provides a system and method that allows a user to control vehicles and other moving entities by using preconfigured geographical zones.

'982 Patent 1:36-39; 1:48-53; 1:57-59. After introducing the geofencing feature, the '982 Patent proceeds to restate the claim language of various system and method claims presented in the patent applications for the '982 Patent and other family members. *Id.* 1:60-5:23. As WirelessWerx points out, the '982 Patent thus contemplates that "the claimed solution for providing local control of an entity having an attached transponder in a defined geographical zone with a plurality of [coordinates] was not available prior to the invention." ECF No. 15, PageID.293. WirelessWerx argues that "there are concrete meaningful steps that illustrate that the claims are patent eligible" because the claim language of representative Claim 1 "is limited by the elements of (1) an entity, (2) a transponder, (3) a microprocessor, and (4) a pixilated image of an enclosed area representative of a geographical zone, which, when programmed, is a specific implementation of a technological improvement to entity tracking." *Id.*

In light of the disclosure of the '982 Patent, the Court finds that representative Claim 1 is not focused on a technological improvement, but rather, recites a generic computer implementation of the abstract idea of location-based control, i.e., monitoring the location of an entity and taking some action to control the entity

35

based on its location. As became more apparent at oral argument, WirelessWerx's basic contention is that representative Claim 1 is focused on a "technological improvement" over existing tracking systems because the transponder-based architecture of the '982 Patent—including where the method steps recited in representative Claim 1 are performed through the use of a different mode of operation (local instead of remote) and specified hardware (a transponder attached to the entity), position information (coordinates), and storage (an enclosed area on a pixilated image)—was a previously unavailable "technological solution" to the "technological problem" of allowing users to monitor and control an entity in relation to a geographical zone. However, with respect to the claim language, WirelessWerx does not identify anything more than "a claimed invention [that] only performs [this] abstract idea on a generic computer." *BSG Tech*, 899 F.3d at 1285.

In particular, as implied by the generically worded claim language, the written description demonstrates that the transponder recited in representative Claim 1 is a generic computer for monitoring and controlling an entity. According to the claim language, similar to the generic "computing device," the nondescript "transponder" includes a set of generic computer components. Specifically, along with a generic "memory," the transponder includes a generic "microprocessor" that performs the computational method steps pursuant to its "programming" and "configuring." '982 Patent 27:30-44. Likewise, in the written description, the '982 Patent explains that

the transponder simply serves as an "intelligent device" that "works to collect, process, and communicate information" about an entity and can "issue various commands and instructions" thereto. *Id.* 6:38-45. *See also id.* 11:52-55 (explaining that the transponder is "controlled by an at least 32-bit processor"); 11:59-60 (explaining that the transponder can "report, observe, and analyze numerous logical events").

As with the transponder generally, WirelessWerx does not identify any computer functionality improvements embodied by the memory or the microprocessor. Instead, in the written description, the '982 Patent describes these and other components of the transponder as conventional. As its basic components, the transponder of the '982 Patent includes a processor, one or more modems, a GPS receiver, and a memory module. *Id.* 6:45-49; 9:20-22. With respect to these components, the '982 Patent contemplates sourcing off-the-shelf technology from existing tracking systems and their communications networks. *Id.* 9:33-35 (contemplating a "Motorola MMC2114 32-Bit RISC" processor); 9:43-44 (contemplating a "GSM" or a "CDMA" cellular modem); 9:53-54 (contemplating a "Sky Wave DMR-200" satellite modem); 9:28-30 (contemplating a "12-Channel Trimble SQ" or a "Lapaic UV40" GPS receiver); 9:32-33 (contemplating a processor with "RAM"); 9:36-38 (contemplating a memory module with "additional memory chips").

Similarly, WirelessWerx does not identify any computer functionality improvements embodied by the pixilated image recited in representative Claim 1. WirelessWerx does not discuss the nondescript "pixilated image" except to list "a pixilated image of an enclosed area representative of a geographical zone" among the claim elements. ECF No. 15, PageID.293. While WirelessWerx does not address this point, the pixilated image of the '982 Patent is, by all appearances, technologically comparable to, if not the same as, a conventional computer map used in existing tracking systems. *See*, *e.g.*, '982 Patent 1:50-53 (describing that existing tracking systems utilized GPS technology for "plotting the position of the vehicle on a computer map" after "relaying the GPS information to a control center or a web server"); 16:42-45 (describing an embodiment in which "a pixel map of a geographical zone" "is first presented to the user as a geographical map on a screen connected to a computing device") (numbering omitted). Notably, in connection with its own infringement theory, WirelessWerx appears to assert that the pixilated image recited in representative Claim 1 is essentially a generic computer map for storing a geographical zone. Specifically, in the claim chart attached to the FAC, WirelessWerx alleges that Audi performs the "programming" step for defining a geographical zone on a pixilated image whenever an Audi vehicle's Multi Media Interface (MMI) screen displays a user-defined geofence on a navigation map. ECF No. 10-2, PageID.138-140.

38

Accordingly, the Court finds that representative Claim 1 is not focused on a technological improvement. As opposed to any patent eligible claim elements or method steps that make "non-abstract improvements to the functionality of a computer or network platform itself," the asserted "technological improvement to entity tracking" is simply "a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *TecSec*, 978 F.3d at 1293.

### 8.  Summary

In summary, the Court finds that the concept of location-based control as recited in representative Claim 1 of the '982 Patent is an abstract method of organizing human activity, an abstract mental process, and an abstract process of collecting and analyzing information. Moreover, the Court finds that representative Claim 1 is not focused on a technological improvement, but rather, recites a generic computer implementation of the abstract idea. As instructed by the Federal Circuit, because the claim language recites no more than "a claimed invention [that] only performs an abstract idea on a generic computer," the Court concludes that representative Claim 1 "is directed to an abstract idea at step one." *BSG Tech*, 899 F.3d at 1285.

### B.  Step Two

Having found at step one that representative Claim 1 of the '982 Patent is directed to an abstract idea, the Court will now proceed to step two of the patent

eligibility analysis. At step two, if the claims are directed to a patent ineligible concept, then courts must consider the claim elements "both individually and as an ordered combination" to determine whether the claims contain "additional elements" that "transform" the concept into a patent eligible "application." *Alice*, 573 U.S. at 217 (quotations omitted). These "additional elements" must involve more than performance of "well-understood, routine, conventional activities previously known to the industry." *Id.* at 225 (quotation and citation omitted). The Supreme Court has described step two as a search for an "inventive concept" in a claim element or a combination of claim elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (quotations and alteration omitted).

In accordance with these principles, the Federal Circuit has explained that "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290. As well, if "a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques," then "the claim has not been transformed into a patent-eligible application of an abstract idea." *Id.* at 1290-91.

For computer-related technology, the Federal Circuit has held that "claims for methods that improve an existing technological process include an inventive concept

40

at step two." *In re Killian*, 45 F.4th at 1382 (quotation and alteration omitted). "And claims that recite a specific, discrete implementation of the abstract idea rather than preempting all ways of achieving an abstract idea using a computer may include an inventive concept." *Id.* (quotations and alteration omitted). "But claims to an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way do not pass muster at step two." *Id.* (quotation omitted). "Neither attempting to limit the use of the idea to a particular technological environment nor a wholly generic computer implementation is sufficient." *Id.* at 1382-83 (quotations and alteration omitted).

In its Motion to Dismiss, Audi argues at step two that representative Claim 1 of the '982 Patent does not contain an inventive concept because the claim language "merely recites conventional computer components without adding anything new or inventive." ECF No. 12, PageID.162. As described by Audi, representative Claim 1 "utilizes prevalent practices and mental methods performable by the human mind to identify a geographic zone and monitor activity in the zone," and "recites merely conventional computer components—a computing device, transponder, microprocessor, and entity—to carry out its abstract idea." *Id.*, PageID.162, 169. Audi argues that the claim language amounts to "merely computerizing an abstract idea" because the "generic recitations fail to embody any improvements to the

41

recited computing device, transponder, microprocessor, or entity." *Id.*, PageID.162, 172.

In its Opposition, WirelessWerx argues that representative Claim 1 of the '982 Patent contains an inventive concept in "the ordered combination of the claim elements" through which the claim language recites the technological improvement of "wireless control of an entity through an attached transponder in a geographical zone that is defined by a plurality of coordinates in the memory of the transponder." ECF No. 15, PageID.304-305. As explained by WirelessWerx, in the '982 Patent, the "problem to be solved" is providing "a system and method that allows a user to control vehicles and other moving entities by using preconfigured geographical zones." *Id.*, PageID.304. Additionally, the "technological solution" of the '982 Patent "specifies the physical components of a transponder attached to an entity with a microprocessor that is programed to define a geographic zone on a displayed a pixilated image and determine the occurrence of an event as the transponder moves through the geographical zone." *Id.* As to why representative Claim 1 contains an inventive concept, WirelessWerx argues that "clearly a result alone is not claimed, rather the implementation of a mechanical invention with physical elements is claimed, including (1) an entity, (2) a transponder, (3) a microprocessor, and (4) a pixilated image of an enclosed area representative of a geographical zone, which,

42

when programmed, is a specific implementation of a technological improvement to entity tracking." *Id.*, PageID.297.

Moreover, WirelessWerx argues that "this specific method" of "wireless control of an entity" is not only non-generic, but also was unconventional. *Id.*, PageID.304-305. In support of its argument, WirelessWerx points out that the '982 Patent contemplates that "the claimed solution for providing local control of an entity having an attached transponder in a defined geographical zone with a plurality of [coordinates] was not available prior to the invention," and that "there is no record evidence of the claimed solution existing prior to the invention." *Id.*, PageID.293. "Thus," according to WirelessWerx, "at this stage of the litigation, the claimed improvements cannot be said to be conventional when viewing the claim as a whole." *Id.*, PageID.302. Furthermore, WirelessWerx argues that the claims of the '982 Patent "do not try to preempt every use of controlling an entity with respect to a geographic region, but rather recite a specific way to control an entity with respect to a geographic region thus claiming additional features that render the claims patent eligible." *Id.*, PageID.303.

In light of the disclosure of the '982 Patent, the Court finds that representative Claim 1 does not contain an inventive concept. Specifically, in connection with the focus on location-based control, "it is clear that the claim[] contain[s] no inventive concept" because, as recited by the claim language, the transponder and other

43

components for implementing the abstract idea "are all generic computer elements." *Intell. Ventures I*, 792 F.3d at 1368.

As to why representative Claim 1 contains an inventive concept, WirelessWerx points to the recited entity, transponder, microprocessor, and pixilated image as "physical" claim elements that, according to WirelessWerx, constitute "a specific implementation of a technological improvement to entity tracking." ECF No. 15, PageID.297. Having considered the relevant caselaw, the Court is not persuaded.

The Supreme Court has made clear that, to supply an inventive concept, a claim element or a combination of claim elements must involve more than performance of "well-understood, routine, conventional activities previously known to the industry." *Alice*, 573 U.S. at 225 (quotation and citation omitted). As such, the Federal Circuit has explained that "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *In re TLI Commc'ns*, 823 F.3d at 613 (explaining at step two that a conventional telephone unit and a generic server "fail[ed] to add an inventive concept sufficient to bring the abstract idea into the realm of patentability"). Additionally, the Federal Circuit has made clear that "the inquiry is not whether conventional computers already apply" the abstract idea to which claims are directed. *Intell. Ventures I*, 838 F.3d at 1318. That is to say, "the relevant inquiry

44

is not whether the claimed invention as a whole is unconventional or non-routine." *BSG Tech*, 899 F.3d at 1290 (rejecting patentee's argument that "the asserted claims recite unconventional features" in connection with the abstract idea "that provide benefits over conventional prior art databases"). "Rather, [courts] determine whether 'each step does no more than require a generic computer to perform generic computer functions.'" *Intell. Ventures I*, 838 F.3d at 1318-19 (emphasis omitted) (quoting *Alice*, 573 U.S. at 225).

As to the claim elements WirelessWerx identifies, the entity does not contribute to an inventive concept because an entity is inherent in the concept of location-based control. Even in the context of the generically worded claim language, the term "entity" stands out as the most abstract and non-inventive of all, as the '982 Patent makes clear in contemplating embodiments in which the entity is any movable object, including a person or an animal existing in nature. Moreover, with respect to the transponder, its microprocessor, and the pixilated image, WirelessWerx does not identify any limitations on these claim elements that would embody any computer functionality improvements. As set forth above, the nondescript "transponder," as exemplified by the generic "microprocessor" thereof, is a generic computer for monitoring and controlling an entity, and the nondescript "pixilated image" is essentially a generic computer map for storing a geographical zone.

45

Correspondingly, WirelessWerx does not, and cannot, rebut Audi's basic contention that the claim language recites generic computer components for implementing the abstract idea of location-based control. Indeed, the Court notes that the claim elements of representative Claim 1 are indistinguishable from various computer-based claim elements that the Federal Circuit has found to be insufficient to constitute an inventive concept. *See*, *e.g.*, *Intell. Ventures I*, 792 F.3d at 1368 (explaining that a database, a user profile, and a communication medium "are all generic computer elements"); *Elec. Power*, 830 F.3d at 1355 (explaining that "off-the-shelf" computers, networks, and displays "are not even arguably inventive"); *SAP*, 898 F.3d at 1169-70 (explaining that various databases and processors recited by the claims were "just already available computers, with their already available basic functions, to use as tools in executing the claimed process"); *Beteiro*, 104 F.4th at 1359 (explaining that the inclusion of GPS on a mobile phone was "conventional (even as of 2002) computer equipment").

Accordingly, the claim elements WirelessWerx identifies "fall squarely within [the Federal Circuit's] precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea." *In re TLI Commc'ns*, 823 F.3d at 614. As instructed by the Federal Circuit, the Court concludes that representative Claim 1 does not contain an inventive concept because "[i]nstructing one to 'apply' an abstract idea and reciting no more than generic

46

computer elements performing generic computer tasks does not make an abstract idea patent-eligible." *Intell. Ventures I*, 792 F.3d at 1368 (collecting cases).

### C. Summary

For the reasons set forth above, the Court finds that representative Claim 1 of the '982 Patent, considered as a whole and in light of the written description, is directed to an abstract idea at step one and does not contain an inventive concept at step two. Because representative Claim 1 of the '982 Patent is therefore not directed to patent eligible subject matter, the Court finds that the claims of the '982 Patent are invalid as patent ineligible. Accordingly, the Court finds that Audi is entitled to dismissal of the FAC.[3]

## V. FORM OF DISMISSAL AND LEAVE TO AMEND

In its Motion to Dismiss, Audi asks the Court to dismiss the FAC with prejudice. In its Opposition, to the extent the Court finds that Audi is entitled to dismissal, WirelessWerx asks the Court for leave to amend the FAC under Federal Rule of Civil Procedure 15(a)(2).

Federal Rule of Civil Procedure 15(a)(2) provides that a district court "should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "But a court need not grant a motion to amend when the reason for amendment is

---

[3] The Court need not address Audi's separate argument that WirelessWerx's alleged rules violations independently justify dismissal.

improper, such as," *inter alia*, "futility of amendment." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737 (6th Cir. 2022) (quotation and emphasis omitted). "An amendment is futile when, after including the proposed changes, the complaint still could not withstand a Rule 12(b)(6) motion to dismiss." *Id.* (quotation omitted).

Here, WirelessWerx seeks leave to amend if "the Court finds that the Complaint failing to plead a plausible claim of patent infringement." ECF No. 15, PageID.306. If the Court grants leave to amend, then WirelessWerx states that it "will address any issues identified by the Court and more particularly plead infringement" and "would further identify unresolved factual issues in the patent." *Id.*, PageID.305. According to WirelessWerx, "[s]uch amendment would not be futile, rather, such amendments would be in the interests of justice." *Id.*

The Court finds that leave to amend is not warranted for two reasons. First, WirelessWerx's request for leave to amend appears to be boilerplate language. While WirelessWerx suggests that it could re-plead infringement, Audi does not challenge the plausibility of WirelessWerx's infringement allegations in its present Motion to Dismiss. And while WirelessWerx suggests that it could create factual disputes surrounding the disclosure of the '982 Patent, neither party has identified any existing factual disputes between them that bear on patent eligibility.

Second, WirelessWerx has not complied with the clear requirements for seeking leave to amend. Federal Rule of Civil Procedure Rule 7(b)(1) requires that

48

"[a] request for a court order must be made by motion" and "state with particularity the grounds for seeking the order." Fed. R. Civ. P. 7(b)(1) & (b)(1)(B). Furthermore, Local Rule 15.1 requires that "[a] party who moves to amend a pleading shall attach the proposed amended pleading to the motion." E.D. Mich. LR 15.1. As the Sixth Circuit has explained, "implicit in Rule 15(a) is that the district court must be able to determine whether 'justice so requires,' and in order to do this, the court must have before it the substance of the proposed amendment." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quotation and alteration omitted). "Indeed, a bare request in an opposition to a motion to dismiss — without any indication of the particular grounds on which amendment is sought — does not constitute a motion within the contemplation of Rule 15(a)." *Id.* (quotation omitted). In accordance with these requirements, the Sixth Circuit has held that failure to file a motion to amend or a proposed amended complaint is sufficient grounds for dismissal with prejudice. *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 844 (6th Cir. 2012).

Because WirelessWerx's request for leave to amend appears to be boilerplate language, and WirelessWerx in any event has failed to file a properly supported motion pursuant to the clear requirements for seeking leave to amend, the Court, as requested by Audi, will dismiss the FAC with prejudice.

49

## VI.   CONCLUSION

For the reasons stated in this Opinion and Order, the Court will **GRANT** Audi's Motion to Dismiss. The Court hereby **ORDERS** that WirelessWerx's First Amended Complaint (ECF No. 10) is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

Dated: March 26, 2026                         s/F. Kay Behm
                                              F. Kay Behm
                                              United States District Judge